**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>INTERNAL REVENUE SERVICE,<br><br>Appellants,<br><br>v.<br><br>RONALD KEITH ANDERSON and<br>CARMEN WEBB ANDERSON<br><br>Appellees. | ) | Case Nos.<br>23-cv-02139-BCL-tmp (Lead Case)<br>23-cv-02232-BCL-tmp (Member Case) |

## ORDER REVERSING AND REMANDING

Before the Court are two appeals from the United States Bankruptcy Court for the Western District of Tennessee (Case Nos. 23-cv-02139-BCL-tmp (Lead Case) and 23-cv-02232-BCL-tmp (Member Case)). Judge Mark S. Norris was assigned to these appeals when they were filed and briefed back in 2023, and he consolidated the two cases per the parties' request.[1] Docs. 10, 12. For the reasons that follow, the Court **REVERSES** the Bankruptcy Court's grant of summary judgment to Debtors, **VACATES** the resulting judgment, and **REMANDS** for further proceedings consistent with this Order.

[1] These appeals were filed in March 2023. Doc. 1. The next day, Judge Mark S. Norris was assigned to the appeals. Briefing on the appeals closed in August 2023. Doc. 17. The docket reflects no activity following the IRS's August 2023 reply brief until Judge Norris' transfer of the appeals to the undersigned roughly two-and-a-half years later. Doc. 18. The Parties confirmed that, despite the passage of roughly two-and-a-half years since the close of briefing, the case may still be resolved on the existing briefs. Doc. 20. It thus appears that the lengthy delay prior to transfer neither was caused by nor resulted in (through the passage of time) a change in the governing law.

**BACKGROUND**

**A.** In 2001 and 2002, Ronald and Carmen Anderson reported multi-million-dollar losses on their joint income tax returns. Doc. 13 at 10. These losses were generated through an unlawful tax shelter known as the "Distressed Debt Strategy." *Id.* at 12; Doc. 16 at 9. In December 2001, Ronald Anderson purchased distressed debt owed to a Russian energy company for $139,050, held it for 13 days, and sold it to an affiliate of the tax shelter promoter for $138,128. Doc. 13 at 11–12. Based on this, the couple claimed a tax loss of more than $12 million, reflecting the difference between the debt's face value and its market sale price. *Id.* They engaged in a similar transaction the following year. *Id.* at 12; Doc. 16 at 10.

The IRS commenced an audit of the returns in 2005, ultimately disallowing the deductions arising from the Distressed Debt Strategy for 2001 and 2002. Doc. 13 at 14; Doc. 16 at 10. On May 8, 2013, the Andersons stipulated to a Tax Court decision in favor of the IRS, which led to a formal tax liability assessment in 2014. Doc. 13 at 14. After losing in the Tax Court and before filing for bankruptcy, the Andersons filed a malpractice and fraud lawsuit against the accountants, lawyers, and investment managers who promoted the tax shelter, seeking $66 million in damages. *Id.* at 15; Doc. 16 at 10. Because the Andersons failed to pay their assessed income taxes, a federal tax lien attached to all of their property, including their legal claims in the malpractice litigation. Doc. 13 at 15–16; Doc. 16 at 11.

On February 23, 2015, the Andersons filed a Chapter 7 bankruptcy petition, listing the malpractice lawsuit as the estate's largest asset. Doc. 13 at 16; Doc. 16 at 11. The Bankruptcy Court issued a discharge order in June 2015. Doc. 13 at 16; Doc. 16 at 12.

The United States filed a proof of claim for $18,067,986.87. Doc. 13 at 16. In August 2015, an IRS Bankruptcy Specialist sent the Andersons a standard form letter (Letter 4068). *Id.* The letter stated in pertinent part as follows:

> The discharge you received under Chapter 7 of the Bankruptcy Code personally discharged you from liability for certain tax debts as outlined later in this letter. This personal discharge does not apply if we later discover that you made a fraudulent return or willfully attempted to evade or defeat the tax.

*Id.* at 17; Doc. 16 at 12.

Within the bankruptcy proceedings, the Chapter 7 Trustee assumed control of the malpractice litigation. Doc. 13 at 17. The United States consented to subordinate its secured tax lien to the trustee's administrative costs and attorneys' fees. *Id.* at 18. The trustee ultimately settled the malpractice claims for a total of $6,664,999.00. The United States did not object to these settlements, which the Bankruptcy Court approved as fair and reasonable. *Id.* at 19; Doc. 16 at 13. As the sole priority creditor paid under the Chapter 7 distribution scheme, the IRS received $3,678,641.20 from the estate. *Id.*

**B.** In February 2021, the United States attempted to collect the remaining unpaid tax balance, prompting the current litigation. *Id.* at 18. Realigned as the plaintiff with the burden of proof, the United States sought a declaration under 11 U.S.C. § 523(a)(1)(C) that the remaining tax debt is non-dischargeable because the Andersons filed fraudulent returns and willfully evaded taxes. *Id.* at 20. The Andersons asserted affirmative defenses of equitable estoppel, judicial estoppel, and quasi-estoppel. *Id.*

Three of the Bankruptcy Court's rulings are relevant here.

*First,* the United States moved for partial summary judgment on the estoppel defenses that the Andersons asserted. The Bankruptcy Court denied the United States' motion on the ground

that detrimental reliance and the nature of the IRS letter were disputed questions of fact. Doc. 13-2 at 137.

*Second*, following the close of discovery, the Andersons moved for summary judgment. The Bankruptcy Court granted summary judgment to the Andersons based on quasi-estoppel, concluding that the government's non-dischargeability claim directly conflicted with its acceptance of the malpractice settlement proceeds. Doc. 13-5 at 1.

*Third*, the Bankruptcy Court also granted the Andersons' motion to strike several items from the appellate record, including an order and associated documents reflecting the conditional admission of the government's expert financial report. Doc. 13-5 at 87.

The IRS now appeals both summary judgment rulings and the order striking items from the appellate record. Doc. 13. Appellees filed their Response Brief on July 17, 2023. Doc. 16. Appellant filed their Reply Brief on August 4, 2023. Doc. 17. Judge Norris transferred the case to the undersigned in March 2026. Doc. 17.

## LEGAL STANDARD

The Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a)(1). In a bankruptcy proceeding, the district court reviews the bankruptcy court's conclusions of law de novo and its findings of fact for clear error. *Nicholson v. Isaacman (In re Isaacman)*, 26 F.3d 629, 631 (6th Cir. 1994). "A finding of fact is clearly erroneous 'when although there is evidence to support it, the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Mathews (In re Mathews)*, 209 B.R. 218, 219 (6th Cir. BAP 1997).

## LEGAL ANALYSIS

**I. The Bankruptcy Court erred in granting summary judgment to the Andersons based on quasi-estoppel.**

An order granting summary judgment is reviewed de novo. *See Renfro v. Indiana Michigan Power Co.*, 497 F.3d 573, 575 (6th Cir. 2007).

The Bankruptcy Court granted summary judgment to the Andersons based on quasi-estoppel. Doc. 13-5 at 8. Specifically, the Bankruptcy Court concluded that quasi-estoppel applied because the United States' position that the Anderson's tax debt was non-dischargable was, in the Bankruptcy Court's view, "completely at odds with the benefits it already received from the BDL [malpractice] litigation," and specifically the settlements in that litigation. Doc. 13-5 at 11.

"The doctrine of quasi-estoppel 'forbids a party from accepting the benefits of a transaction or statute and then subsequently taking an inconsistent position to avoid the corresponding obligations or effects.'" *In re Kelley*, 216 B.R. 806, 808 (Bankr. E.D. Tenn. 1998). "Quasi-estoppel 'does not require a misrepresentation by one party or actual reliance by another party.'" *Kroger Specialty Pharmacy FL 2, LLC v. Genefic Specialty Pharmacy, Inc.*, No. 3:23-CV-001217, 2024 WL 1774000, at *8 (M.D. Tenn. Apr. 24, 2024). Rather, the party invoking quasi-estoppel need only prove that (1) the other party has in the past taken a position (or acquiesced in a position or transaction) that is inconsistent with its current position, and (2) the other party gained some benefit from the earlier, inconsistent position such that it is inequitable to allow the other party to change its tune and avoid the effects or obligations that are consistent with its earlier position. *In re Kelley*, 216 B.R. at 808.

At the outset, it is worth highlighting what the Government is *not* arguing: While the Government says "[i]t is an open question whether the United States may be estopped at all," Doc. 13 at 23, the Government never actually argues in this case that the Government may not be

estopped or, more narrowly, that it is not subject to quasi-estoppel.[2] The Court therefore need not decide those issues.

The Government does, however, argue that quasi-estoppel has no application in this case. For at least two reasons, the Court agrees that the Bankruptcy Court erred in granting summary judgment to Debtors based on quasi-estoppel.

**A. The record does not contain evidence supporting a finding that the IRS took inconsistent positions as required to establish quasi-estoppel.**

All agree that quasi-estoppel[3] applies only if the to-be-estopped party is attempting to take a position that is inconsistent with a position it earlier took, or in which it acquiesced, or from which it accepted a benefit. Doc. 16 at 29 (Debtors, quoting *In re Dow Corning Corp.*, 419 F.3d 543, 553 (6th Cir. 2005) (recounting Texas' law of quasi-estoppel)); Doc. 13 at 32–33 (Government: "For quasi-estoppel to apply, the estopped party must take a position that is inconsistent with a previous acceptance of benefits."). And no one suggests that the Government has formally taken two inconsistent positions, as by taking one position in the bankruptcy and another position in the collection action that gave rise to this appeal.

---

[2] The Government famously enjoys some protection from estoppel and similar doctrines. For example, the Supreme Court has held that "nonmutual offensive collateral estoppel is not to be extended to the United States." *United States v. Mendoza*, 464 U.S. 154, 158 (1984). Whatever the legal merits of that exemption, it makes sense as policy: Even Homer nodded, and there is little reason that a mistake made or position taken by one Government attorney should bind the federal government forever and for all time in other cases. But that policy rationale gets shakier when the estoppel becomes narrower—when, say, it is tied to a particular litigant or transaction. (It is perhaps relevant here that the Supreme Court has read a form of issue preclusion into the Eighth Amendment's double jeopardy clause. *See Ashe v. Swenson*, 397 U.S. 436, 444 (1970).) And it becomes particularly attenuated with respect to doctrines that require some showing of wrongdoing by the Government and/or detrimental reliance by the opposing party, as with equitable estoppel. After all, "[i]t is no less good morals and good law that the Government should turn square corners in dealing with the people than that the people should turn square corners in dealing with their Government." *St. Regis Paper Co. v. United States*, 368 U.S. 208, 229 (1961) (Black, J., dissenting). But, as noted, the Court need not here decide whether estoppel in general, or quasi-estoppel in particular, applies against the Government.

[3] As an aside, *quasi*-estoppel sounds like a recent, hastily developed innovation—a loose doctrine, of the sort so often adopted by Courts during the Twentieth Century, that unhelpfully erodes the rules and standards that keep related doctrines in their proper place. And perhaps it has that effect, muddying up the larger body of estoppel doctrines. But for whatever it is worth, quasi-estoppel has roots stretching back to at least the nineteenth century. *See Simmons v. Burlington, C.R. & N.R. Co.,* 159 U.S. 278, 291 (1895).

Instead, Debtors' argument, adopted by the Bankruptcy Court, is that there exists an inconsistency in the Government's (1) accepting bankruptcy proceeds derived from the malpractice litigation prosecuted by the Trustee, and then (2) claiming that the tax debt was not dischargeable because the Debtors engaged in fraudulent conduct. Doc. 16 at 42. The Debtors offer no authority supporting application of quasi-estoppel in that scenario, which would appear to extend quasi-estoppel to bind every creditor to every position taken by a debtor or trustee in litigation (or at least successful litigation) brought on behalf of a bankruptcy estate (on the theory that the creditors are accepting the benefit of the in-flows to the estate resulting from the litigation). Absent authority compelling it, the Court will not impose that extreme result.

Debtors attempt to pivot to a narrower rule (suggested without precise definition by the Bankruptcy Court) under which the Government is bound to positions taken by the Trustee in the malpractice litigation because the Government was a lienholder that could have prosecuted the malpractice claim itself and is therefore in privity with the Trustee.[4] Doc. 16 at 43. Debtors seemingly recognize (but leave largely unelaborated) that this is an attempted pivot away from quasi-estoppel and to judicial estoppel. *Id.* (framing the argument in terms of judicial estoppel). As Debtors' most relevant cases demonstrate, the Trustee, as representative of the bankruptcy estate, had authority to bind the Government and any other creditor *within the malpractice litigation or with respect to the malpractice litigation*. *See U.S. v. Schnick*, 66 B.R. 491, 493–94 (W.D. Mo. 1986) (where Trustee earlier asserted failed claim seeking to recover taxes purportedly owed to creditor IRS, doctrine of claim preclusion barred Government's later assertion of claim seeking recovery of those taxes); *In re American Hawk Enterprises, Ltd.*, 52 B.R. 395 (E.D.Va.

[4] The malpractice litigation ended in settlement. The Sixth Circuit has held that, while settlements do not usually give rise to judicial estoppel, bankruptcy settlements can do so. *See Audio Technica U.S., Inc. v. United States*, 963 F.3d 569, 576 (6th Cir. 2020).

1985) (where Trustee earlier settled claim based on piercing of Debtor's corporate veil, Creditor was barred from reasserting claim by doctrine of claim preclusion). But Debtors have offered neither authority showing nor explanation of why the Trustee's positions within the malpractice litigation should somehow preclude creditors (lienholders or otherwise) from defending their rights *outside of that litigation in a way that does not attack the malpractice settlement or judgment.* To adopt that position would be in substantial tension with the settled rule that a Trustee has broad power to maximize a bankruptcy estate for the *benefit* of creditors (as opposed to in diminishment of their rights). *See Williamson v. United States,* 309 F.2d 892, 896 (6th Cir. 1962) ("'The Bankruptcy Act gives the trustee extraordinary powers to assert claims against property both in the possession of the reorganization court and in the hands of third persons in cases where the debtor would be estopped to act and, in some cases, even where creditors could not succeed.'" (quoting 6 Collier on Bankruptcy (14th ed.), par. 8.02, p. 2419)).

In any event, even if the Trustee's position in the malpractice litigation did bind the Government outside of that litigation, here there is no "clear[ ] inconsistenc[y]" between the Trustee's position in the malpractice action and the Government's claim of nondischargeability, as required for application of judicial estoppel (or, for that matter, quasi-estoppel). *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001); *see also Chevron Cor. v. Doninger*, 833 F.3d 74, 128 (2d Cir. 2016) (in context of judicial estoppel, holding estoppel does not apply in the absence of "irreconcilable conflict" between positions). The malpractice litigation involved multiple claims and ended in settlement, so that the Trustee did not truly take a "position" in the sense relevant here—the way it would have had it offered evidence at trial in an effort to convince the court or a jury to find for it on whatever claims remained; moreover, the record does not reflect the reasons for the settlement and the claims or theories on which it is based. And even if one looks through

to *all* of the claims asserted in the complaint in the Malpractice Litigation, Debtors never explain with any specificity exactly how the claims—or the allegations in support of the claims—in the Malpractice Litigation are clearly inconsistent with the Government's claim of non-dischargeability. Read charitably and doing a lot of the legwork on their behalf, the Debtors' argument appears to bottom out on the high-level assertion that there exists an inconsistency in (1) the theories in the Malpractice Litigation involving allegations that various service providers wronged the Debtors in promoting the tax shelter to them, misinforming them about the shelter's legality, failing to inform them of the shelter's illegality, and convincing Debtors to use the shelters,[5] and (2) the Government's claim that the resulting debt to the Government is non-dischargeable because the Debtors submitted a fraudulent return or willfully attempted to evade or defeat taxes by using the tax shelter. The argument fails because it rests on mere tension concerning apportionment of blame for the Debtors' use of the tax shelter. There is no "clear inconsistency" because (as the Government notes) both propositions can be true: The various malpractice defendants could have wronged the Debtors by misleadingly advocating the tax shelter, and the Debtors could have acted fraudulently or willfully in ultimately using it, even if they never would have done so without the Malpractice Defendants' promotion of the shelter. In addition, the Government's claim of nondischargibility independently rests on the Debtors' alleged dissipation of assets, which is in no way inconsistent with the positions taken in the Malpractice Litigation. So, no matter which angle you view it from, while it is possible to read the allegations contrary to each other, they can also be reconciled—meaning the conflict is not "clear" and "irreconcilable" as required for estoppel.

[5] The claims in the actually filed Malpractice Litigation included: breach of fiduciary duty, negligence and gross negligence, disgorgement, declaratory judgment, unjust enrichment, rescission, fraud, civil conspiracy, and breach of contract. Doc. 13-3 at 41; 84–109.

Finally, although it does no load-bearing work in this case, the Court notes that we are speaking here of estoppel *against the Government*—a litigant that, for better or worse, under established law enjoys some special solicitude in the estoppel analysis. *See supra* note 2. That is all the more reason to keep the starch in the inconsistency standard, to ensure that the Government is only estopped when its positions are clearly and irreconcilably inconsistent. But, as noted, even without any special solicitude, the Government's position here is not inconsistent with the Trustee's position in a way and to a degree capable of supporting estoppel (whether quasi- or judicial).

**B. The "affirmative misconduct" requirement independently requires reversal of the Bankruptcy Court's grant of summary judgment to Debtors.**

The Government argues that quasi-estoppel (and, seemingly, estoppel more generally) can apply against the Government only if the Government has engaged in affirmative misconduct—which, the Government claims, has no support in this summary judgment record. Debtors argue that a showing of affirmative misconduct is not a requirement for quasi-estoppel, and that the summary judgment record in any event does demonstrate affirmative misconduct.

**1.** On the issue of whether there exists an affirmative misconduct requirement for quasi-estoppel against the Government, the Parties view their disagreement as turning largely on a parsing of *United States v. River Coal Co.*, 748 F.2d 1103 (6th Cir. 1984), to determine whether it insisted on affirmative misconduct in the context of quasi-estoppel or some other doctrine. *Id.* at 1108 ("At the very minimum some affirmative misconduct by a government agent is required as a basis of estoppel."). Truth be told, it is difficult to tell precisely what type of estoppel was at issue in that case. The Sixth Circuit's opinion never identified the precise species of estoppel, but: close one eye and it looks like quasi-estoppel because the claim seems to have been that the Government switched positions on whether it would seek post-petition interest; close the other eye and the

Court's mention of reasonable reliance and detriment to the Debtor makes it look like equitable estoppel was perhaps at issue. The best reading is that the case involved quasi-estoppel, because there was no mention of a misleading statement by the Government or its agent; rather, the basis for the estoppel was omission of a claim in bankruptcy proceedings.

In any event, while the *River Coal* opinion does not make clear precisely what sort of estoppel was at issue in that case, it does make clear the overarching message that, generally speaking, a showing of affirmative misconduct is required to invoke estoppel against the Government. For one thing, the Sixth Circuit spoke in broad terms applicable to estoppel generally: "At the very minimum some affirmative misconduct by a government agent is required as a basis for estoppel." *Id.* at 1108. And while broad language in an opinion should not be overread—i.e., as extending beyond the facts and issues directly at issue in that case—here other features of *River Coal* confirm that the Sixth Circuit was applying a broad rule cutting across estoppel doctrines. For example, the Sixth Circuit invoked the Supreme Court's broad statement that "the Government may not be estopped on the same terms as any other litigant" because "[w]hen the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined." *Id.* (quoting *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60 (1984)). That statement of policy applies to estoppel broadly, and is perhaps particularly important for a loosey-goosey doctrine like quasi-estoppel. And then there is the fact that *River Coal* cited estoppel cases indiscriminately, which is to say it did not limit itself to any one sort of estoppel. *See id.* (relying on *Utah Power & Light Co. v. United States*, 243 U.S. 389 (1917) (seemingly addressing equitable estoppel and quasi-estoppel); *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380 (1947) (addressing either equitable estoppel or quasi-estoppel, without distinguishing the two); *INS v. Miranda*, 459 U.S. 14

(1982) (involving some unidentified form of estoppel based on delay and best viewed as quasi-estoppel, and noting protection of the public fisc as a quintessential context in which the government is protected from usual estoppel rules); *Schweiker v. Hansen*, 450 U.S. 785 (1981) (equitable estoppel); *Matter of Becker's Motor Transportation, Inc.*, 632 F.2d 242 (3d Cir.1980) (same)). These considerations confirm the conclusion that, under *River Coal*, the affirmative misconduct requirement applies to quasi-estoppel.

In arguing to the contrary, Debtors note that the Sixth Circuit in *Reynolds v. Commissioner* held that the affirmative misconduct requirement does not apply to judicial estoppel against the Government because that doctrine protects the integrity of the judicial process. *See* 861 F.2d 469 (6th Cir. 1988).[6] For at least three reasons, that logic does not extend to the invocation of quasi-estoppel in this case. *First*, *Reynolds* involved a question concerning *who* was responsible for taxable gains (the Government was trying to double dip), so *Reynolds*—unlike this case—did not directly involve a question of whether the Government could obtain an amount owed at all (or, relatedly, whether it must spend money). In the latter sort of situation—cases like this one directly affecting the public fisc—the Sixth Circuit has required a showing of affirmative misconduct for invocation of even judicial estoppel. *See State of Mich. v. City of Allen Park*, 954 F.2d 1201, 1217 (6th Cir. 1992). *Second*, quasi-estoppel can be triggered by events outside of the judicial context, and if courts were to dispense with the affirmative misconduct requirement for quasi-estoppel they would render for naught the doctrinal safe-guards built into equitable estoppel: Smart litigants would bypass equitable estoppel and its requirement of affirmative misconduct altogether in favor of an easier-to-satisfy quasi-estoppel doctrine stripped of that requirement. And, *third*, the Sixth

[6] It is perhaps more accurate to say that the Sixth Circuit determined that judicial estoppel inherently involves affirmative misconduct because it requires "a knowing assault on the integrity of the judicial system." *Id.* at 474. But the discussion in the text accepts Debtors' framing.

Circuit has treated judicial estoppel as a category unto itself based on its unique function in protecting the judicial process, which means precedents relating to judicial estoppel do not naturally extend to other doctrines, like equitable estoppel. *See United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995) ("Judicial estoppel serves a different function from other forms of estoppel, such as equitable estoppel or collateral estoppel.").

The bottom line, then, is that a showing of affirmative misconduct is required to apply quasi-estoppel against the Government. This requires proof of "an act by the government that either intentionally or recklessly misleads the claimant. The party asserting estoppel against the government bears the burden of proving an intentional act by an agent of the government and the agent's requisite intent." *Michigan Exp., Inc. v. United States*, 374 F.3d 424, 427 (6th Cir. 2004); *accord Fitzgerald Truck Parts & Sales, LLC v. United States*, 391 F. Supp. 3d 794, 799 (M.D. Tenn. 2019).

**2.** There remains the question whether, on this summary judgment record, a reasonable factfinder could find affirmative misconduct. *See* Doc. 16 at 30 (Debtors recognizing this standard). The Court need not reach this issue because the lack of inconsistency (discussed above) forecloses application of quasi-estoppel. But, if the Court were to reach the issue, the Court would conclude that the Bankruptcy Court erred in granting summary judgment based on quasi-estoppel because the record presents a question of fact concerning whether the Government either "intentionally or recklessly mislead[ ]" Debtors. *Michigan Exp., Inc.*, 374 F.3d at 427.

Recall the facts. After the Debtors filed their Chapter 7 Petition listing the malpractice action as the largest asset (Doc. 13 at 16) and received a discharge, an agent of the United States sent a letter stating:

> The discharge you received under Chapter 7 of the Bankruptcy Code personally discharged you from liability for certain tax debts as outlined later in this letter.

> This personal discharge does not apply if we later discover that you made a fraudulent return or willfully attempted to evade or defeat the tax.

Doc. 13 at 17; Doc. 16 at 12. The agent delayed sending that letter because the United States was for a time considering whether to file a claim for nondischargeability; she also apparently believed that the letter would preserve the United States' rights if it determined it had a basis to claim non-dischargeability later. *In re Anderson*, 650 B.R. at 515, 520.

The United States also subordinated its lien and then sat passively while the Trustee entered into settlements that were (for sake of this argument only) inconsistent with the Government's ultimate claim of non-dischargeability. Doc. 13 at 17–18. Then, after receiving the resulting payout, the United States in 2021 claimed nondischargeability, ultimately leading to this litigation. Doc. 16 at 20.

One way of looking at this is as an intentional plot or reckless acts by the Government making it unfair—inequitable—for the Government to now recover the allegedly non-dischargeable tax debts. *See Michigan Exp., Inc.*, 374 F.3d at 427. But it is also plausible to see all of this as an example of clumsy and slow-moving administrative bureaucracy, or the right hand not fully knowing what the left was doing, or even the Government in good faith waiting to see the outcome of the Malpractice Litigation before expending public resources to fully investigate and determine the issue of nondischargeability. On that view—frankly, more persuasive to the undersigned—the Government's actions amount to at worst negligence, which is insufficient to support a claim of quasi-estoppel. *Id.* What matters here is that a rational factfinder could see it either way, which means that the Bankruptcy Court erred in granting summary judgment on this basis, because this quintessentially fact issue concerning intent and state of mind should have been left for determination after trial. But, again, that is all beside the point here because the lack of an irreconcilable inconsistency on the part of the Government dooms application of quasi-estoppel.

**C. The Government's invocation of unclean hands fails.**

The Government also argues that the Bankruptcy Court erred in granting summary judgment based on quasi-estoppel because (1) the Bankruptcy Court failed to consider the Government's unclean hands argument, and (2) there exists evidence that would allow a reasonable factfinder to conclude that the Debtors have "unclean hands" by virtue of the fact that they committed tax fraud—that is, because they pursued the distressed debt strategy despite knowing that it lacked economic substance. Doc. 13 at 38–39. The Bankruptcy Court certainly should have addressed this argument because, if accepted, it would have precluded summary judgment based on quasi-estoppel.

But the Bankruptcy Court's failure is ultimately of no moment here for two independent reasons.

*First*, the Bankruptcy Court's application of quasi-estoppel was error for the reasons already discussed in this Order, leaving no need to consider the unclean hands doctrine.

*Second*, the Government's invocation of unclean hands fails because the purported "unclean" action—the underlying tax fraud—is too far removed from the downstream activities—the Government's actions during and after the pendency of the bankruptcy proceedings—underlying the claimed quasi-estoppel. The doctrine of unclean hands can preclude an estoppel defense when the party invoking estoppel is "guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1383 (6th Cir. 1995). But the "unclean" conduct must have an "immediate and necessary relation to the equity that [the party invoking estoppel] seeks in respect of the matter in litigation." *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245–46 (1933). And here, there is no "immediate and necessary

relation" between (1) the underlying alleged fraud that led to the claim of non-dischargeability, and (2) the Government's later alleged shifting positions concerning that claim during bankruptcy proceedings. Indeed, taking the Government's view to its logical conclusion, no defendant facing a claim of fraud (or involving allegations similar to fraud) could ever invoke an estoppel doctrine, no matter how egregious the plaintiff's conduct during the course of later negotiations or litigation concerning the alleged fraud. The Government has cited no case supporting that inequitable result, and the Court will not stretch equitable doctrines to invite inequity without authority requiring that counterintuitive result.[7]

So the Government's arguments concerning application of the unclean hands doctrine do not change the bottom line here. And for that reason, the Court need not and does not address the Government's challenge to the Bankruptcy Court's Order on the admissibility of Dr. Cragg's report from the Record on Appeal (Doc. 13 at 43–45), because the order at issue "relates to unclean hands." Doc. 13 at 44; Doc. 17 at 19.

## II. The Bankruptcy Court should reassess the United States' Motion for Partial Summary Judgment in light of this Order.

In addition to challenging the Bankruptcy Court's grant of summary judgment to the Debtors based on quasi-estoppel, the Government also seeks reversal of the Bankruptcy Court's denial of the Government's Motion for Partial Summary Judgment on the Debtors' various estoppel defenses. For at least the following three, independently sufficient reasons, the Court does not address that argument here, but instead remands with instructions for the Bankruptcy Court to

[7] Finally, it is perhaps worth noting that the Government's invocation of unclean hands presupposes its success on the underlying claim of tax fraud—because the tax fraud is what allegedly rendered Debtors' hands unclean. The upshot then is that the Government's argument of unclean hands, if accepted, could preclude summary judgment against the Government based on estoppel, but it could not on its own support summary judgment for the Government based on estoppel (unless the Government could also prevail on the merits on summary judgment).

revisit that ruling if the Government chooses to refile its motion for partial summary judgment following remand.

*First*, the Government apparently moved for summary judgment with respect to all estoppel defenses, but the Bankruptcy Court addressed them only in a cursory order that: (1) did not treat the defenses separately, and (2) identified only two, apparently non-exhaustive, purportedly material issues of disputed fact precluded summary judgment. Because the Order is so general and terse, as a practical matter, this Court would be addressing the Government's arguments against the Debtors' various estoppel defenses and related issues in the first instance. That runs contrary to the principle that an appellate court—as this Court is here—is "a court of review, not first view." *United States v. Kimbrough*, 138 F.4th 473, 480 (6th Cir. 2025).

*Second*, briefing closed on the Government's Motion for Partial Summary Judgment on January 24, 2022, and the Bankruptcy Court entered its Order denying that Motion on February 25, 2022 (Doc. 13-2 at 138)—all before discovery closed on May 16, 2022. Doc. 27, Bankruptcy Court Docket No. 27 (Oct. 18, 2021) (Agreed Order Granting Joint Motion for Extension). As a result, the Government's Motion for partial summary judgment was decided before the record was fully developed. If the United States again moves, the Bankruptcy Court should decide the renewed motion based on a fully developed summary judgment record.

*Third*, the analysis in this Order has potential application to not only the doctrine of quasi-estoppel, but also estoppel doctrines more generally. The Bankruptcy Court should consider any renewed motion for summary judgment in light of this Order, to the extent it has applicability to the arguments raised.

## CONCLUSION

For the foregoing reasons, the Bankruptcy Court's Order granting summary judgment to the Debtors based on quasi-estoppel is **REVERSED**, the resulting judgment is **VACATED**, and the case is **REMANDED** to the Bankruptcy Court for further proceedings consistent with this Order.

**SO ORDERED**, this 6th day of November, 2026.

*s/ Brian C. Lea*
BRIAN C. LEA
UNITED STATES DISTRICT JUDGE